IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KENNETH LEWIS MURRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.4:13-CV-00219-REL-SSA |
| | ) | |
| CAROLYN COLVIN, Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kenneth Lewis Murray seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for supplemental security income benefits

under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the Administrative

Law Judge (ALJ) (1) failed to find plaintiff's impairments meet the requirements of Listing

12.04 on affective disorders; (2) failed to properly evaluate the opinions of plaintiff's treating

psychiatrist and a consulting psychologist; and (3) erred by relying on a faulty residual functional

capacity (RFC) to find that plaintiff could perform light work. I find that the substantial evidence

in the record as a whole supports the ALJ's conclusion that plaintiff is not disabled. Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the Commissioner

will be affirmed.

## I.    COMMISIONER'S DECISION

On September 21, 2009, plaintiff protectively filed his application for supplemental

security income (Tr. 243-48). On January 22, 2010, plaintiff's claim was denied at the initial

level (Tr. 77-81). On July 6, 2011, an administrative hearing was held before the ALJ (Tr.

56-73). At the conclusion of that hearing, the ALJ determined it was necessary to supplement the

medical record by the performance of consultative examinations. On August 3, 2011, plaintiff

underwent a consultative psychological examination (Tr. 856-63). On August 11, 2011, plaintiff underwent a consultative physical examination (Tr. 871-77). On April 3, 2012, a supplemental hearing was held before the ALJ (Tr. 26-48). On April 26, 2012, the ALJ found that plaintiff is not under a disability as defined in the Act (Tr. 8-25). On February 4, 2013, the Appeals Council denied plaintiff's request for review (Tr. 1-6). Therefore, the April 26, 2012 decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the

substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and Marianne K. Lumpe, M.A., a vocational expert, at the July 5, 2011 initial hearing; the testimony of Nancy L. Winfrey, Ph.D., a medical expert, and Jenifer Duchene, a vocational expert, at the April 3, 2012 supplemental hearing;[1] and the documentary evidence admitted at the April 3, 2012 supplemental hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative report, which shows plaintiff earned the following income from 1971 through 2003:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1971 | $ 275.20 | 1988 | $122.77 |
| 1972 | 507.20 | 1989 | 189.01 |
| 1973 | .00 | 1990 | 119.35 |
| 1974 | .00 | 1991 | 6.35 |
| 1975 | 395.00 | 1992 | .00 |
| 1976 | 1,082.09 | 1993 | .00 |
| 1977 | 284.72 | 1994 | .00 |

---

[1] Although not under oath, plaintiff made several statements at the end of the April 2012 hearing (Tr. 46-48).

| | | | |
|---|---|---|---|
| 1978 | .00 | 1995 | .00 |
| 1979 | .00 | 1996 | .00 |
| 1980 | 3,280.40 | 1997 | .00 |
| 1981 | 268.63 | 1998 | .00 |
| 1982 | 473.87 | 1999 | .00 |
| 1983 | 449.90 | 2000 | .00 |
| 1984 | .00 | 2001 | .00 |
| 1985 | 961.54 | 2002 | 37.93 |
| 1986 | 290.92 | 2003 | 565.87 |
| 1987 | .00 | | |

(Tr. 256).

## B.    *SUMMARY OF MEDICAL RECORDS*

As summarized by plaintiff on appeal, the medical record reflects diagnosis and treatment of multiple medical problems including poly-substance abuse, bipolar/depressive disorder, anxiety disorder, schizoaffective disorder, and right-knee osteoarthritis.

## C.    *SUMMARY OF TESTIMONY*

During the July 6, 2011 initial hearing, plaintiff and Marianne K. Lumpe, M.A., a vocational expert, testified. During the April 3, 2012 supplemental hearing, Nancy Winfrey, M.D., a medical expert, and Jenifer (Duchene) Telxeira, a vocational expert, testified.

## 1.    **Plaintiff's Testimony**

At the July 6, 2011 hearing, plaintiff testified that he was then 53 years old, completed the eleventh grade, and has a general equivalency degree (GED). Plaintiff stated that he was released from prison on July 14, 2010, and he denied working since his released from prison.

Plaintiff reported that he had worked through a temp service at J.C. Penney's before going to prison (Tr. 61).

When questioned about his physical problems, plaintiff testified that his knees, particularly the right knee, swell up and cause him pain. Plaintiff attributed the knee problems to an incident in which he was shot in the lower extremities. Plaintiff reported a limited ability to walk because of knee pain, but he acknowledged that he could walk farther with a cane. Plaintiff said that the pain and swelling are worse when it is hot and humid (Tr. 62-63).

In addition to his knee pain, plaintiff testified that he is depressed. Plaintiff described insomnia and nightmares resulting from a car wreck that occurred while he was being transported from prison to his mother's funeral. Plaintiff acknowledged that his medication allows him to sleep five-and-one-half hours a night (Tr. 63-64). Plaintiff reported that he hears voices telling him that people are going to hurt him. When hearing these voices, plaintiff said that he cannot sit too long around people (Tr. 65-66). Plaintiff initially reported that he is unable to concentrate (Tr. 66), however, he later reported that "the medication they [gave him] help[ed] [him] to focus, stay focused" (Tr. 68). Plaintiff testified that he used all types of drugs in the past "to try to take way [himself] from reality." Plaintiff reported that "[e]ven before [he] used the drugs, [he] was depressed." Plaintiff stated that he realizes that illicit drugs make his mental problems "more severe" and his physical problems "worse." Plaintiff represented that he ceased taking illicit drugs about seven or eight months before the July 2011 hearing (Tr. 66-68).

**2.    Medical Expert's Testimony**

At the April 3, 2012 supplemental hearing, Nancy Winfrey, M.D., a medical expert, testified at the request of the ALJ. Dr. Winfrey divided plaintiff's mental problems between (1) the poly-substance abuse and (2) the remaining affective and personality disorders (Tr. 31-32).

Dr. Winfrey identified the drug and alcohol abuse as the "primary difficulty regarding [plaintiff's] functioning" (Tr. 32). Functionally, the medical expert found that plaintiff has moderate difficulties with activities of daily living, with and without the poly-substance abuse; marked difficulties maintaining social functioning with the poly-substance abuse, but only moderate difficulties without; mild difficulties maintaining concentration, persistence, and pace, with and without the drugs and alcohol abuse; and minimal risk of decompensation when abusing alcohol or illicit drugs but no risk when abstaining from such substances. (Tr. 32-33).

3.      **Vocational Experts' Testimony**

At the July 6, 2011 hearing, Marianne K. Lumpe, a vocational expert, identified only one past job for plaintiff: warehouse worker for J.C. Penney's. The vocational expert classified the job as medium and unskilled. However, the ALJ did not find that this temporary job was held long enough to qualify as relevant past work (Tr. 68).

At the July 6, 2011 hearing, the ALJ posed a hypothetical question with a limitation to medium work (Tr. 70). The hypothetical individual could lift and carry 50 pounds occasionally and 25 pounds frequently; could sit six to eight hours during an eight-hour day; stand and walk six hours out of eight hours; has unlimited postural abilities except no climbing ladders, ropes, or scaffolds, no crawling, and no kneeling; could not interact with the general public; could occasionally interact with co-workers and supervisors; and is limited to repetitive work without any detailed instructions, i.e., SVP 2 or lower (Tr. 69). Ms. Lumpe opined that such an individual could perform medium unskilled jobs including lab-equipment cleaner, linen-room attendant, and porter (Tr. 70-71).

However, the expert also opined that the identified jobs would be precluded if the hypothetical individual is off task and unable to do even simple jobs one-third of the workday;

misses more than 10 to 12 days of work a year; or requires breaks beyond the typical mid-morning, lunch, and mid-afternoon breaks (Tr. 71-72).

At the April 3, 2012 hearing, the ALJ posed a hypothetical question with a limitation to medium work (Tr. 40). The hypothetical individual could lift and carry 30 pounds occasionally and 20 pounds frequently; could sit six to eight hours out of eight hours; stand and walk three to four hours out of eight hours, but only one hour at a time; has unlimited postural abilities except no climbing ladders, ropes, or scaffolds, no crawling, and no kneeling; could not interact with the general public; could occasionally interact with co-workers and supervisors; and is limited to repetitive work without any detailed instructions, i.e., SVP 2 or lower (Tr. 40-41). Ms. Duchene opined that the 30-pound weight limit excluded medium work (Tr. 41). However, she opined that such an individual could perform light unskilled jobs including electrical assembler, merchandise marker, and mail clerk (Tr. 41-42).[2]

Ms. Duchene opined that if the hypothetical individual has marked difficulty interacting appropriately with supervisors or individuals, has deficits in attention and concentration that total two-and-one-half hours or more in an eight-hour workday, such an individual would not be able to maintain competitive employment (Tr. 43-44). Additionally, the expert opined that the typical absenteeism tolerance for such unskilled work is one day a month (Tr. 44).

## V.  FINDINGS OF THE ALJ

ALJ George M. Bock published his decision on April 26, 2012. The ALJ found that plaintiff has not engaged in substantial gainful activity since he protectively filed his claim on September 21, 2009 (Tr. 13).[3] The ALJ found that plaintiff's substance abuse, depressive

---

[2]  On questioning by plaintiff's counsel, Ms. Duchene reduced the incident rate of the identified occupations by 70% due to the sit/stand option inherent in the walking/standing limit (Tr. 42-43).

[3]  Although plaintiff answered "no," when asked at the July 2012 hearing if he had any kind of job since he got out of prison in July 2010 (Tr. 62), the 2011 and 2012 medical records contain references to work activities with CWT

disorder, osteoarthritis of the right knee, personality disorder, and schizoaffective disorder are severe impairments (Tr. 13-14).

The ALJ found that plaintiff's substance-abuse disorder meets the severity requirements of Listing 12.09 on substance-addiction disorders, in combination with Listings 12.04 on affective disorders, 12.06 on anxiety disorders, and 12.08 on personality disorders, from the application protected filing date, September 21, 2009, through November 30, 2010 (Tr. 14-.17). However, when the substance abuse is not a factor for this period, the ALJ found that no Listing is met (Tr. 18), that plaintiff retains the RFC to perform a wide range of light work (Tr. 18), that plaintiff has no relevant past work (Tr. 18), and that plaintiff can perform other jobs existing in significant numbers in the national economy (Tr. 19). Because alcoholism and drug addiction are not bases for obtaining disability benefits, the ALJ found that plaintiff is not disabled for the period from September 21, 2009 to November 30, 2010 (Tr. 19).

The ALJ then determined that there has been medical improvement in plaintiff's substance-addiction disorder as of December 1, 2010 (Tr. 20), and that plaintiff no longer meets the severity requirements of Listing 12.09 as of that date (Tr. 20). For the period beginning on December 1, 2010, the ALJ found that no impairment meets or equals the severity requirement of a Listing (Tr. 20), that plaintiff retains the ability to perform a wide range of light work (Tr. 20), and that plaintiff can perform other jobs existing in significant numbers in the national economy (Tr. 20-21). For the period beginning December 1, 2010, the ALJ found that plaintiff is not disabled (Tr. 21).

## VI.     ANALYSIS.

## A.     LISTINGS

---

(compensated work therapy). However, on various questionnaires, wages from the CWT work are listed at less than $1,000.00/month (Tr. 835-36, 841, 846, 847, 848,927-32, 934-35, 938, 944, 953, 970-72, 981-84, 986-999, 1003, 1006, 1014, and 1024).

Plaintiff first argues that the ALJ erred by failing to find that his mental health impairments meet the severity requirements of Listing 12.04 on affective disorders. Plaintiff argues that his signs and symptoms of sleep disturbance, mood disturbance, difficulty concentrating, thoughts of suicide, hallucinations, and paranoid thinking meet the "A" criteria of Listing 12.04, and that his marked difficulties in maintaining social function and marked difficulties in maintaining concentration, persistence, or pace, meet the "B" criteria of Listing 12.04. The Commissioner responds that the ALJ properly determined that plaintiff's remaining impairments are not disabling without the effects of substance abuse prior to December 1, 2010 and not disabling after December 1, 2010 due to medical improvement and effective management of plaintiff's substance abuse disorder.

Listing 12.04 - Affective Disorder is met when the medical record documents a disturbance of mood accompanied by a full or partial manic or depressive syndrome, and the mood colors the plaintiff's whole psychic life. In addition, the medical record must document four of the following depressive characteristics:

- Anhedonia or pervasive loss of interest in almost all activities;

- Appetite disturbance with change in weight;

- Sleep disturbance;

- Psychomotor agitation or retardation;

- Decreased energy;

- Feelings of guilt or worthlessness;

- Difficulty concentrating or thinking;

- Thoughts of suicide; or

- Hallucinations, delusions, or paranoid thinking.

The depressive syndrome must also result in at least two of the following: (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.04.

Alcoholism and drug addiction are not a basis for obtaining disability benefits. Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat. 847 (amending 42 U.S.C. § 423(d)(2)); Kluesner v. Astrue, 607 F.3d 533, 537 (8th Cir. 2010), citing Pub.L. No. 104-121, 110 Stat. 852-56 (1996). The relevant provision of the law provides that "[a]n individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." P.L. No. 104-121 § 105(a)(1); P.L. No. 104-121 § 105(b)(1) (amending SSI disability benefits under Title XVI).

Drug addiction or alcoholism is "material" when an individual would not be disabled if alcohol or illicit drug use were to cease. 20 C.F.R. § 416.935; Brueggemann v. Barnhart, 348 F.3d 689, 694-95 (8th Cir. 2003) ("The plain text of the relevant regulation requires the ALJ first to determine whether [plaintiff] is disabled. 20 C.F.R. § 404.1535(a) . . . The ALJ must reach this determination initially . . ., using the standard five-step approach described in 20 C.F.R § 404.1520 without segregating out any effects that might be due to substance use disorders. . . . The inquiry here concerns strictly symptoms, not causes . . . If the gross total of a [plaintiff's] limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent." (citations and footnote omitted)).

When it is determined that an individual's remaining limitations are not disabling, the Commissioner will find that the individual's drug addiction or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 416.935(b)(2)(i). When it is determined that an individual's remaining limitations are disabling, the Commissioner will find the individual disabled independent of drug addiction or alcoholism, and will find that the drug addiction or alcoholism is not a contributing factor material to the determination of disability. Id at § 416.935(b)(2)(ii). In determining materiality under 42 U.S.C. § 423(d)(2)(c) or 1382c(a)(3)(J), the plaintiff bears the burden of proving that his or her alcoholism or drug addiction is not a contributing factor material to his or her disability determination. Kluesner, at 537.

The Commissioner concedes that plaintiff has other mental problems, but argues that the ALJ found that these are not of the severity to meet the requirements of Listing 12.04.

The administrative regulations do not require a plaintiff to be symptom free in order to be found not disabled. Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) (the mere presence of a mental disturbance is not disabling *per se*, absent a showing of severe functional loss establishing an inability to engage in substantial gainful activity). Even though a plaintiff has been prescribed antidepressant drugs, this is not evidence that the mental impairment is disabling. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (prescription of antidepressant drugs does not show that the claimant is disabled).

The ALJ noted that plaintiff has a long history of poly-substance abuse, primarily cocaine and alcohol. The ALJ also found that plaintiff has a sporadic work history, has been incarcerated, relapsed into drug abuse after he was released from his most recent incarceration, failed to follow-up on sobriety and abstinence, complained about mental health symptoms that treating

sources opined were intertwined with his substance abuse, and was less than fully compliant in the treatment of his emotional problems (Tr. 13). I find that treating records from the local Veteran's Administration Medical Center confirm these findings.

At the time plaintiff filed his claim, he was incarcerated at the Western Missouri Correctional Center in Cameron, Missouri (Tr. 265-71).[4] On July 28, 2010, plaintiff told a treating source that he had been released from prison on July 14, 2010 (Tr. 518). On August 30, 2010, plaintiff reported that he had "been 'in an out of jail my whole life' for various crimes including assault, drugs, and stealing. He last served 5 years for receiving stolen goods." Plaintiff stated he had to serve the full sentence because he "kept getting into trouble, fighting, and stuff" while in prison (Tr. 463). There was no use of alcohol, cocaine, or any other illicit drug while plaintiff was incarcerated at the Western Missouri Correctional Center in 2005-2010. However, plaintiff tested positive for cocaine, marijuana, opiates, and benzodiazepines when he was briefly admitted to the Veterans Administration faculty on August 30, 2010 after having expressed plans to kill someone who owed him money (Tr. 499; 436-508).

Plaintiff was referred to a rehabilitation program, which began on September 15, 2010. On intake, plaintiff reported first using alcohol at age 15 and first using cocaine at age 22. Plaintiff reported using of marijuana but denied using PCP, LSD, or heroin. Plaintiff "admit[ed] to only 1 year in the past that he was able to stay sober, [plaintiff] admit[ed] to several eras of incarceration that occurred because of [his history] of drug use, [c]ocaine ha[d] made his life unmanageable. His drug use affected his relationships with his family and friends" (Tr. 398).

Plaintiff gave a history of being arrested over 10 times for a total lifetime incarceration of 23 years (Tr. 417). Plaintiff reported that prior to his incarceration in 2005, he drank a fifth of

---

[4] An individual is not eligible for supplemental security income benefits for any month throughout which he is a resident of a public institution. See 20 C.F.R. § 416.211. Prisons are public institutions.

brandy along with a few beers and wine every other day. Plaintiff stated that he had been drinking about ½ pint of rum every day since his discharge from prison in July 2010 and that his last drink was the day before he began the rehabilitation program (Tr. 421). Since his release from prison, plaintiff reported that he had been using about ½-1 gram of cocaine each time he ingested the drug. Plaintiff reported that he relapsed four times since July 2010 and that his last use was three days before entering the rehabilitation program (Tr. 422).

Plaintiff graduated from the drug treatment program on October 6, 2010. His global assessment of functioning (GAF) was 55 (Tr. 588).[5] However, on the evening of November 15 and the morning of November 16, 2010, plaintiff was seen in the emergency room at the local Veteran's Administration Medical Center. Plaintiff was eventually hospitalized, "because, even after detoxing for a while he continued to have thoughts of self-harm and told [the staff physician] he had a plan of walking into traffic." Plaintiff admitted that he was not compliant with treatment and his sobriety ended two days after discharge from the rehabilitation program. Plaintiff described gradually increasing depression. Plaintiff told the doctor that "the only thing he ha[d] an interest in [was] cocaine, he state[d] that his appetite [was] decreased, [he] ha[d] less need for sleep, [he] ha[d] guilt over his drug use" and he had passing thoughts of suicide (Tr. 363). Plaintiff gave a history of using 100 dollars of cocaine and drinking a fifth of vodka. Plaintiff tested positive for cocaine, marijuana, opiates, and benzodiazepines (Tr. 566).

Substantial evidence supports the finding of the ALJ that plaintiff's mental impairments meet the requirements of Listings 12.09, 12.04, 12.06, and 12.08, with consideration of the poly-substance abuse, but do not meet the requirements of any Listing, including Listing 12.04, without consideration of the poly-substance abuse from September 2009 to November 2010.

---

[5] A GAF of 51-60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers and co-workers). *Diagnostic and Statistical Manual of Mental Disorders* 32 (Am. Psychiatric Ass'n. ed., 4th ed. 1994).

As noted by the ALJ, since November 2010, plaintiff has denied any use of illicit drugs or alcohol, except for one beer in October 2011 (Tr. 931). Drug testing has been negative for illicit drug use (Tr. 821-22, 898-99, 1045). I agree with the ALJ that plaintiff's alcoholism and drug addiction have been in remission since December 1, 2010.

At the same time, since December 1, 2010, plaintiff has not required any inpatient hospitalization for his remaining mental health problems, e.g., affective disorder, anxiety disorder, or schizoaffective disorder. While plaintiff continues to take prescription medication for his emotional problems, he sees mental health providers on an infrequent basis. Plaintiff has worked for CWT (compensated work therapy).

Although plaintiff alleges a long history of emotional problems and asserts that his poly-substance abuse has been a method of self-medication for the psychiatric problems, the poly-substance abuse dates back to age 15 for the alcohol and age 22 for the cocaine, far before plaintiff alleges his emotional problems began.

While plaintiff has a valid argument as to his evidencing the signs and symptoms required by the "A" criteria of Listing 12.04, the Commissioner is correct that plaintiff minimizes the impact of his poly-substance abuse prior to December 1, 2010 and his improvement since that date. Although plaintiff cites examples of continued functional limitations after December 1, 2010, the record fails to support the level of severity advanced by plaintiff. While there are some medical opinions supporting at least "marked" functional limitations, the ALJ cited other evidence that contradicts these medical opinions.

Therefore, I find substantial evidence supports the ALJ's finding that, absent the poly-substance abuse, plaintiff's affective disorder does not meet the severity requirements of Listing 12.04.

**B.    MEDICAL OPINIONS**

Next, plaintiff contends that the ALJ improperly evaluated the opinions of the medical sources.

I find conflicting medical opinions by a treating psychiatrist, an examining psychologist, and a medical expert who testified at the supplemental hearing.

Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis. SSR 1996-5; *see* 20 C.F.R. §404.1513(a) (defining "acceptable medical source"). Generally, the opinions of an examining psychologist or physician should be given greater weight that the opinions of a source who had not examined the claimant. Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003).

The opinion of a treating physician is "generally given controlling weight, but is not inherently entitled to it." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007)(quoting Hacker v. Barnhart, 439 F.3d 934, 937 (8th Cir. 2006). An ALJ may elect not to give controlling weight to a treating physician when their opinions are "not supported by diagnoses based on objective evidence" or if the opinions are "inconsistent with or contrary to the medical evidence as a whole." Id. A treating physician's opinions may be entitled to less weight if the opinions are not supported by his or her own treatment notes. Owen v. Astrue, 551 F.3d 792, 789-99 (8th Cir. 208).

First, plaintiff argues that the June 30, 2011, opinion of Michael G. Smith, M.D., his treating psychiatrist, is entitled to controlling weight, or at least significant weight, because it is based upon his personal treatment, as well as access to over 20 years of plaintiff's treatment with

the Veteran's Administration. In response, the Commissioner argues that the ALJ properly considered and discussed Dr. Smith's opinion, but found that plaintiff's progress notes with the Veteran's Administration do not support the psychiatrist's assertions.

On June 30, 2011, Dr. Smith completed a *Mental Impairment Questionnaire (Listings)* form at the request of plaintiff's counsel. Dr. Smith reported that plaintiff has been treated by the Veteran's Administration since 1990; diagnosed plaintiff as having a schizoaffective disorder; rated plaintiff as having a GAF of 45 current and 50 past year;[6] and opined that plaintiff has marked restriction of daily activities, extreme difficulties maintaining social functioning; extreme difficulties maintaining concentration, persistence, or pace; and experienced repeated episodes of decompensation in work or work-like settings (Tr. 850-53).[7]

First, despite Dr. Smith's claim of Veterans Administration treatment dating back to 1999, I find no evidence of any mental health treatment by the Veteran's Administration or any other mental health provider prior to July 28, 2010. When plaintiff began his current treatment at the local Veteran's Administration Medical Center in 2010, he reported no prior psychiatric history and denied any inpatient stays (Tr. 518). As noted by Dr. Winfrey in her April 3, 2012 supplemental hearing testimony (Tr. 35), the 2008-2009 medical records from the Missouri Department of Corrections contain repeated denials by plaintiff of mental health issues, reflect no mental health treatment, and record no mental disorder diagnosis (Tr. 324-90).

Next, I note that Dr. Smith was first mentioned in the medical record on April 20, 2011 (Tr. 835-37). As Dr. Winfrey stated during her April 3, 2012 supplemental hearing testimony (Tr. 37), Dr. Smith did not treat plaintiff during the period from August 2010 to October 2010,

---

[6] A GAF of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders* 32 (Am. Psychiatric Ass'n. ed., 4th ed. 1994).

[7] The form submitted by plaintiff's counsel to Dr. Smith failed to include the qualifier that the episodes of

nor during the November 2010 hospitalizations when plaintiff abused alcohol and illicit drugs and also described a long history of drug abuse with negative consequences. This is significant because the ALJ questioned Dr. Smith's failure to consider plaintiff's poly-substance dependence.

The ALJ discounted Dr. Smith's opinion because the psychiatrist presented plaintiff as barely functioning mentally. The ALJ remarked that neither the progress notes from the Veteran's Administration nor plaintiffs own statements support this level of impairment. Furthermore, in plaintiff's previous discussion about meeting the severity requirements of Listing 12.04, he implicitly concedes that Dr. Smith's ratings are unsupportable by arguing for "marked" difficulties in maintaining social functioning and maintaining concentration, persistence, or pace despite Dr. Smith's rating of "extreme" in each of these part "B" criteria.

I find the excessive rating and the failure to consider the effects of the poly-substance disorder also apply to Dr. Smith's repeated rating of episodes of decompensation. As noted by Dr. Winfrey in her April 2012 supplemental hearing testimony, the only episodes of decompensation in the record occurred in August, September-October, and November 2010. These episodes were all precipitated by the poly-substance abuse and occurred before Dr. Smith's treatment of plaintiff. Furthermore, plaintiff has not required inpatient hospitalization since Dr. Smith began treating him in early 2011.

In summary, I find that there is substantial evidence supporting the ALJ's decision as to the weight to be given to Dr. Smith's opinion.

Next, plaintiff argues that the ALJ failed to properly weight the opinion of a consulting psychologist. In response, the Commissioner states that the ALJ considered the opinion of the consulting psychologist who examined plaintiff at the ALJ's request, but the judge found that her

---

decompensation must be "each of extended duration."

opinion, too, downplayed plaintiff's substance-abuse problem and accepted plaintiff's explanation that he abused drugs and alcohol to self-medicate his mental problems. Therefore, the Commissioner argues, the ALJ properly discounted the consulting psychologist's opinion.

On August 3, 2011, plaintiff underwent a consultative psychological examination by Kathleen J. King, Ph.D. Plaintiff reported a history of mental problems dating back to his early 20's, minimized his drug and alcohol use, and asserted that the drug and alcohol uses were attempts to self-medicate. Plaintiff reported only two incarcerations to Dr. King. Dr. King diagnosed a schizoaffective disorder, depressive type; major depressive disorder, recurring, moderate; and poly-substance dependence, in nine-month reported remission. The psychologist rated plaintiff as having no limitation in zero work-related areas; mild limitation in two work-related areas; moderate limitation in three work-related areas; marked limitation in three work-related areas; and extreme limitation in the remaining four work-related areas (Tr. 856-63).

When the ALJ considered Dr. King's opinion, he found that the psychologist failed to properly consider plaintiff's poly-substance abuse and its effects on his RFC. The ALJ also expressed concern about Dr. King's reliance on plaintiff's assertions that his poly-substance abuse was a form of self-medicating his allegedly long-standing affective disorder. As pointed out by the ALJ, the poly-substance abuse predates plaintiff's alleged mental-impairment onset date, i.e., plaintiff's alcohol use beginning at age 15 and his cocaine use beginning at age 22, with only 1 year of subsequent sobriety. As noted by Dr. Winfrey, the records from the Missouri Department of Corrections contain no mention of auditory hallucinations and the like. While plaintiff represented to Dr. King that he had been incarcerated two times, he earlier admitted to being in and out of jail his whole life and described eras of incarceration that resulted from his

drug use - over 10 arrests and a total of 23 years in custody.[8]

I find that substantial evidence supports the ALJ's discounting Dr. King's opinion.

Finally, plaintiff argues that the ALJ improperly relied on Dr. Winfrey's opinions when she is neither a treating physician nor an examining physician.

As noted previously, Dr. Winfrey testified at the April 3, 2012 supplemental hearing at the request of the ALJ. The medical expert opined that plaintiff's primary emotional problems relate to his poly-substance abuse. Dr. Winfrey found marked functional limitations with the poly-substance abuse but only mild to moderate functional limitations without the drug and alcohol dependence (Tr. 29-39).

The ALJ relied on Dr. Winfrey to address the complex issues and the conflicting assessments. Although a non-treating and non-examining doctor, the doctor is an expert in disability evaluation. Dr. Winfrey had an opportunity to examine the whole record, including the submissions made by plaintiff before the January and April 2012 hearings. The doctor explained her opinions in detail at the April 2012 hearing. Plaintiff argues that Dr. Winfrey admitted that Dr. Smith concluded the substance dependence was in remission, but Dr. Winfrey correctly observed that Dr. Smith did not treat plaintiff at the time of the 2010 hospitalizations and that the more recent progress notes detract from his opinion. Under the circumstances, I find that the ALJ had ample reason to give controlling weight to Dr. Winfrey's opinions.

In summary, the ALJ considered the medical opinions of record, and I find substantial evidence supports his findings.

**C.     RFC**

Finally, plaintiff argues that the ALJ's RFC evaluation erroneously characterizes his

---

[8] I note that the treatment records available to Dr. King in August 2011 were limited because plaintiff failed to submit many of the records until just prior to his aborted January 2012 hearing

remaining physical capacity as light, rather than sedentary. Furthermore, if the plaintiff's RFC is classified as sedentary, plaintiff argues Rule 201.12 of Table No. 1 of the Medical-Vocational Guidelines directs a finding of disabled. In response, the Commissioner states that the ALJ considered plaintiff's physical complaints, discussed the results of the consultative physical examination, and adequately accounted for plaintiff's physical limitations in his RFC assessment.

Although not a part of the direct evidence of record, there is medical evidence of prior gunshot wounds to plaintiff's knees. Imaging of the right knee shows residual bullet fragments and osteoarthritis (Tr. 514, 646, 696). Imaging of the left knee shows osteoarthritis (Tr. 464, 697). Although plaintiff used a cane at his July 6, 2011 hearing (Tr.62-63), there are virtually no records reflecting any treatment for the condition – there have been no recent hospitalizations due to knee problems, no recent surgery for knee problems, plaintiff does not use a knee brace, and plaintiff has not received any knee injections. Given his history of poly-substance abuse, the VA doctors have treated plaintiff's pain with non-narcotic medication.

Due to the limited treatment of the knee impairment, the ALJ arranged for plaintiff to undergo a consultative physical examination by Joseph Noland, M.D., which was conducted on August 11, 2011. Dr. Noland found minimal abnormal clinical signs of a knee condition. Dr. Noland opined that plaintiff retains the ability to lift and carry 20 pounds continuously and 30 pounds frequently. Additionally, Dr. Noland found that plaintiff can stand and walk one hour at a time for three hours total during an eight-hour workday, and plaintiff has no limitation on sitting (Tr. 864-70).

The ALJ used Dr. Noland's opinion as the basis for his RFC; however, the ALJ modified the RFC, making some parts of the RFC more restrictive and other parts of the RFC less

_____

(Tr. 878-984) or just prior to his April 2012 supplemental hearing (Tr. 985-1049).

restrictive. In view of the limited treatment and minimal clinical abnormalities during Dr. Noland's examination, I defer to the ALJ on his modifications.

The ALJ's RFC is between the sedentary and light exertional levels.[9] The Medical-Vocational Guidelines for sedentary work - when also considering plaintiff's age, education, and lack of work experience - direct a finding of disabled. Rule 201.12, Table No. 1. However, the Medical-Vocational Guidelines for light work - when also considering plaintiff's age, education, and lack of work experience - direct a finding of not disabled. Rule 202.13, Table No. 2.

If the exertional level falls between two rules and the two rules direct opposite conclusions, a vocational expert is recommended to resolve the dilemma. SSR 83-12. As recommended by SSR 83-12, the ALJ elicited testimony from a vocational expert who was able to identify light jobs within the proffered hypothetical. Although the vocational expert admitted a reduction in the number positions available, the additional restrictions do not prevent performance of occupations identified by the DOT as light. Plaintiff does not challenge the validity of the expert's response to the hypothetical. Therefore, I defer to the ALJ as to whether the remaining number of positions is significant.

I find substantial evidence supports the ALJ's finding of jobs available in the national economy that plaintiff can perform.

## VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

---

[9] Dr. Noland's suggested lifting/carry capacity for 30 pounds continuously and 20 pounds frequently, exceeds the definition of light work, i.e., 20 pounds occasionally and 10 pounds frequently. It is between light and medium; however, Ms. Duchene was unable to identify any medium work.

ORDERED that the decision of the Commissioner is affirmed.

**/s/ Robert E. Larsen**
ROBERT E. LARSEN
United States Magistrate Judge

March 14, 2014
Kansas City, Missouri